1  **PERKINS COIE LLP**
   MICHAEL O. WARNECKE, IL Bar No. 2942291
2  Email: MWarnecke@perkinscoie.com
   *(Admitted Pro Hac Vice)*
3  DEBRA R. BERNARD, IL Bar No. 6191217
   Email: DMcMillion@perkinscoie.com
4  *(Admitted Pro Hac Vice)*
   BRANDY R. MCMILLION, IL Bar No. 6294679
5  Email: BMcMillion@perkinscoie.com
   *(Admitted Pro Hac Vice)*
6  131 South Dearborn Street, Suite 1700
   Chicago, IL  60603-5559
7  Telephone: 312.324.8400
   Facsimile:  312.324.9400
8
   **PERKINS COIE LLP**
9  JASON YURASEK (SBN 202131)
   Email: JYurasek@perkinscoie.com
10 Four Embarcadero Center
   Suite 2400
11 San Francisco, CA 94111-4131
   Telephone: 415.344.7021
12 Facsimile:  415.344.7221

13 Attorneys for Defendant

14 TOCAD AMERICA, INC.

15                UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17                 SAN FRANCISCO DIVISION

18

19 JOBY, INC.,                          Case No. 3:07-cv-06455-SI

20              Plaintiff,              **DEFENDANT'S MEMORANDUM IN
                                        SUPPORT OF MOTION FOR SUMMARY
21    v.                                JUDGMENT**

22 TOCAD AMERICA, INC.,                 **[REDACTED PUBLIC VERSION OF
                                        DOCUMENT SUBMITTED UNDER SEAL]**
23              Defendant.

24

25

26

27

28
   ───────────────────────────────────────────────
   DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
   Case No. 3:07-cv-06455-SI

   64319-0007/LEGAL14401095.1

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................. 1

I.    STATEMENT OF ISSUES ..................................................................... 2

II.   STATEMENT OF FACTS ....................................................................... 2

    A.   Characteristics of the Gorillapod .............................................. 2

    B.   Joby's patent filings ................................................................... 3

    C.   History of Tocad's Flexible Tripod............................................. 8

III.  ARGUMENT ........................................................................................... 9

    A.   Standards on Summary Judgment ............................................... 9

    B.   There is No Genuine Issue of Material Fact that the Gorillapod
        Does Not Have a Protectible Trade Dress.................................. 10

        1.   Joby cannot prove that its trade dress is non-functional .............. 11

            a.   The Gorillapod design features are functional.................. 11

            b.   The possible existence of alternative designs does
                not establish non-functionality........................................... 16

            c.   Joby's advertising touts the utilitarian features of the
                Gorillapod .......................................................................... 19

            d.   Summary ............................................................................. 20

        2.   Joby cannot establish secondary meaning..................................... 20

IV.   CONCLUSION...................................................................................... 24

**TABLE OF AUTHORITIES**

Page

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................................... 9, 10

*Antioch Co. v. Western Trimming Corp.*, 347 F.3d 150 (6th Cir 2003) ................. 15, 16, 17, 18

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989) .................................... 18

*Braun Inc. v. Dynamic Corp. of America*, 975 F.2d 815 (Fed. Cir. 1992)............. 10, 20, 22, 23

*Cicena, Ltd. v. Columbia Telecommunications Group*, 900 F.2d 1546 (Fed Cir. 1990) ......... 22

*Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512 (9th Cir. 1989)...................................... 15, 16

*Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234 (1964) .............................................. 8

*Continental Laboratory Products, Inc. v. Medax International, Inc.*, 114 F. Supp. 2d
    992 (S.D. Cal. 2000) ................................................................................................. 11, 23

*Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002 (9th Cir. 1998)........... 10, 17, 19

*Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168 F.3d 28 (Fed.Cir.1999) ................... 13

*Eppendorf-Netheler Hinz GMBH v. Ritter GMBH RK*, 289 F.3d 351 (5th Cir. 2002) ...... 11, 18

*First Brands Corp. v. Fred Myer, Inc.*, 809 F.2d 1378 (9th Cir. 1987) ................................... 23

*Global Manufacture Group, LLC v. Gadget Universe.com*, 417 F. Supp. 2d 1161 (S.D.
    Cal. 2006)............................................................................................................... passim

*Inwood Laboratories, Inc. v. Ives Labpratories, Inc.*, 456 U.S. 844 (1982)........................... 12

*Keystone Camera Products Corp. v. Ansco Photo-Optical Products Corp.*,
    667 F. Supp. 1221 (N.D. Ill. 1987) .................................................................... 14, 22

*Leatherman Tool Group Inc. v. Cooper Industries, Inc.*, 199 F.3d 1009 (9th Cir. 1999).. 15, 18

*Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352 (9th Cir. 1985) ............................... 11, 20

*Microsoft Corp. v. EEE Business, Inc.*, 2008 WL 1990809 (N.D. Cal. May 5, 2008) ............. 9

*Novell, Inc. v. Weird Stuff, Inc.*, 0094 WL 16458729 (N.D. Cal. Aug. 2, 1993) .................... 10

*Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159 (1995) ........................................ 14

*Sears Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964)........................................................ 8

i

*Switchmusic.com, Inc. v. U.S. Music Corp.,* 416 F. Supp. 2d 812 (C.D. Cal. 2006) ........ passim

*Talking Rain Beverage Co., Inc. v. South Beach Beverage Co.,* 349 F.3d 601 (9th Cir. 2003) ........................................................................................................... 11, 19, 20

*Tie Tech, Inc. v. Kinedyne Corp.,* 296 F.3d 778 (9th Cir. 2002) .............................................. 18

*TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23 (2001) ........................... passim

*Vision Sports, Inc. v. Melvill Corp.,* 888 F.2d 609 (9th Cir. 1989).......................................... 10

*Walker & Zanger v. Paragon Indus., Inc.,* 2007 WL 1302980 (N.D. Cal. May 3, 2007) ....... 21

*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.,* 529 U.S. 205 (2000)............................... 10, 11

**Statutes**

15 U.S.C. §1125 ...................................................................................................................... 10

35 U.S.C. § 154 ......................................................................................................................... 6

**Regulations and Rules**

37 C.F.R. §1.56 ........................................................................................................................ 13

**Other Authorities**

Roger E. Schechter & John R. Thomas, *Principles of Patent Law* (2d ed. 2004) ..................... 5

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
Case No. 3:07-cv-06455-SI

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

This is a straightforward trade dress case involving a simple product, a flexible tripod. Significantly, Tocad has agreed to stop selling the products at issue (two models of its flexible tripod) in this litigation as of May 30, 2008 and July 15, 2008. (McMillion Decl., Ex. A, Dkt. 62, Stipulation re Joby's Motion for Preliminary Injunction). Hence, any alleged damages incurred by Joby will have been capped. Moreover, this is not a case that involves a significant amount of money—indeed Joby's initial Gorillapod was introduced in February 2006 and Tocad's first flexible tripod product came on the market in October 2006. (McMillion Decl. ¶¶3, 4). Yet, incredibly even though Tocad has already agreed to discontinue its sales, Joby is intent on vigorously pursuing this litigation. Obviously, Joby would only be entitled to any damages if it can establish a trade dress in the first instance, which as set forth herein, it cannot do.[1] Hence, in an effort to stem the flow of the unnecessary expense of litigation, this case can and should be resolved now on summary judgment. The existing record of Joby's extensive preliminary injunction filings,[2] Joby's own advertising and promotional documents and the utility patent applications filed by Joby on substantially all the same features it now claims as its trade dress, provide a sufficient basis for this Court to determine whether Joby can satisfy its burden to establish that the features it claims as its trade dress are nonfunctional and, if so, whether the Gorillapod acquired secondary meaning in the eight short months it was on the market prior to the entry of the Flexpod and other competitors.

---

[1]    As reflected in Ex. C to the McMillion Declaration, Tocad's gross profits on these products are significantly less than what the legal fees will likely be to continue litigating this matter.

[2]    Within two weeks of serving the Complaint on Tocad, Joby filed a motion for preliminary injunction which included a 24 page memorandum and six declarations which attached nearly forty exhibits. (Dkt. 11-18). The preliminary injunction was resolved by Stipulation and taken off calendar. (Dkt. 61, 62).

**STATEMENT OF ISSUES**

1.    Whether the features Joby claims as its trade dress are nonfunctional.

2.    Whether the Gorillapod acquired secondary meaning in the eight months it was on the market prior to the entry of the Tocad Flexpod.

I.    **STATEMENT OF FACTS**

    A.    **Characteristics of the Gorillapod**

Joby introduced the Gorillapod flexible tripod for sale in February 2006. (McMillion Decl., Ex. D, Bevirt Decl. ¶5).[3]  Joby promotes the advantages of the Gorillapod tripod in that (1) it has "flexible joints that bend and rotate 360° to form the perfect shape," (2) "you can bend and twist them and they'll always keep your camera steady," (3) the Gorillapod "firmly secures your camera to just about anything - anywhere and everywhere," and (4) its "soft rings and rubberized feet prevent your Gorillapod from slipping in even the toughest environments." (www.joby.com) (Excerpts attached to McMillion Decl., Ex. E).  Additionally, Joby's "Product Overview" contains many of the same statements, in addition to statements that the product (1) "[f]eatur[s] over two dozen flexible leg joints that bend and rotate," (2) it is the "only tripod malleable enough to provide you with the perfect shot while wrapped around a tree branch, hanging from a pole, or perched on a jagged rock," and (3) that its "[r]ubberized ring and foot grips provide extra gripping power to grapple wherever you want to go." (McMillion Decl., Ex. F)[4]  The Product Overview *only* addresses the functionality of the Gorillapod product.  Similarly, many of the articles written about or reviewing the Gorillapod tout these functional features. (McMillion Decl., Ex. D, Bevirt Decl. Ex. G).  These are the very same elements that Joby claims constitute its protectible trade dress:

> Joby's distinctive design includes, but is not limited to the non-functional aspects of multiple rounded segments (or "balls")

---

[3]    JoeBen Bevirt, the founder and President of Joby, Inc. submitted a Declaration in support of Joby's Motion for Preliminary Injunction.  That Declaration is attached as Ex. D to the McMillion Declaration.

[4] The Product Overview also touts the functionality through identical statements which appear on the website: "firmly secure your compact digital camera to virtually any surface – anywhere and everywhere" and "flexible joints bend and rotate 360° to form the perfect shape." (*Compare* McMillion Decl., Ex. E *with* McMillion Decl., Ex. F).

2

1      appearing in a "chain," "string" or series arrangement for each leg
       of the tripod, with each segment having a ring around the middle.

2

3    (Compl. ¶ 8).

4        In its answers to interrogatories, Joby expanded its claim of alleged trade dress as follows:

5      The Gorillapod has a body section and three legs made of rounded
       segments (or "balls") connected together. Each of the segments in

6      the legs has a ring around the middle in a color that contrasts with
       the color of the segment, and each segment ends in a "rounded

7      foot." The rounded body, the rounded leg segments, the rounded
       feet, the proportions that Joby selected for the body, legs and feet,

8      and the contrasting rings give the tripod a playful striped look.

9    (McMillion Decl., Ex. G, Joby's Answers to Int. No. 2).

10       Joby has asserted that "the legs and feet...are the key features of the Gorillapod trade

11   dress." (Dkt. 11 - PI Mem. at 19). Moreover, Joby has claimed that various iterations of Tocad's

12   attempts at redesigning a flexible tripod, including different shape segments, different color

13   schemes and different shape feet, still come within the ambit of Joby's alleged trade dress.

14   (Examples of Tocad's redesign efforts that were rejected by Joby as unacceptable are attached to

15   the McMillion Decl. as Ex. H).

16       Initially, the Gorillapod was black with gray rings and feet. (McMillion Decl., Ex. D,

17   Bevirt Decl., Ex. A). In or about August 2007, Joby introduced color versions of the Gorillapod

18   wherein the body and the segments remain black and Joby added color to the circumferential

19   rings and feet. (McMillion Decl., Ex. I).

20       **B.    Joby's patent filings**

21       On January 3, 2006, Joby filed an application for a utility patent in connection with its

22   flexible tripod. (McMillion Decl., Ex. J "the 2006 Parent Application"). On May 9, 2007, Joby

23   filed a continuation application which published on September 13, 2007. (McMillion Decl., Ex.

24   K "the 2007 Continuation Application"). The 2006 Parent Application published on July 5, 2007

25   and in an Office Action dated January 25, 2008, the USPTO rejected all claims in a final rejection

26   on the basis of prior art, including the disclosure that Bevirt "came up with the idea for a flexible

27   tripod with rotating joints that would allow the tripod to be used in locations where conventional,

28   rigid-leg tripods could not be used." (McMillion Decl. Ex. D, Bevirt Decl. ¶2). (McMillion

3

1    Decl., Ex. L).[5]  Claim 1 of the 2006 Application claims an "apparatus" with "a plurality of

2    flexible legs," an "interconnect portion" and a "clip removably attached to said interconnect

3    portion." (McMillion Decl., Ex. J).  In essence, Claim 1 claims a flexible apparatus with legs but

4    without any particular construction.  Claim 2 claims the ball and socket construction.  (McMillion

5    Decl., Ex. J). Claim 5 adds the circumferential ring. (McMillion Decl., Ex. J).  Figure 7 of the

6    2006 Application "illustrates a tripod apparatus according to some embodiments of the present

7    invention."

8         The specification describes Figure 7 in relevant part as follows:

9         A body portion provides a base of support for three flexible legs.
          The flexible legs consist of a series of interconnected ball and
10        socket joint connectors.  The flexible legs are able to be flexed into
          a variety of positions and can be used to support the body portion
11        by forming tripod support.  The flexible legs are able to adapt to
          uneven surfaces to allow the tripod to function in a variety of
12        situations.

13              *              *              *              *

14        Although the flexible legs are illustrated as functioning legs in FIG.
          7, the legs are of sufficient flexibility that they may be used to wrap
15        around items such as bars or other objects in order to fasten the
          tripod apparatus to objects that would not be suitable for mounting
16        of a typical tripod.  In conjunction with the gripping portion, this
          allows the tripod apparatus to be fastened to a variety of objects.
17        For example, when used to position a digital camera, the legs may
          wrap around a vertical gate rail, allowing the mounting of the
18        camera for a photo taking opportunity not previously available.

19

20    ///

21    ////

22    ///

23    ///

24    ///

25

26    _____

      [5]      JoeBen Bevirt filed a Declaration with the USPTO in which he indicated that "an
      apparatus" was publicly displayed at Stanford University in the Spring 1996 as part of a class
27    presentation. (McMillion Decl., Ex. L).  In that Declaration, Bevirt stated that the "apparatus
      consisted of a tripod with flexible legs.  The tripod legs utilized a series of connectors having ball
28    and socket features.  The connectors had a groove machined into their outer periphery and an O-
      ring was placed in the groove.  At the top of the tripod a threaded stud was embedded therein."

                                                    4

1    ///

2    ///

3        The Gorillapod is a commercial embodiment of Fig. 7 of the utility patent application.

4    **Commercial Embodiment[6]**          **Patent Embodiment**

5

6

7

8    

9

10

11

12

13

14

15        As the Court may be aware, the patent prosecution process entails a lot of back and forth

16    between the applicant and the patent examiner. Many times this cross communication results in

17    the rejection of claims, revisions and amendments to claims, and the filing of continuation

18    applications for certain portions of a claimed invention. *See* Roger E. Schechter & John R.

19    Thomas, *Principles of Patent Law* § 7.2.3 (2d ed. 2004). Notably in this case, Joby had engaged

20    in such communication setting forth substantial evidence of the functionality of the Gorillapod.

21    On July 7, 2007 in response to a rejection of claims in the 2006 Parent Application, Joby

22    amended its claims to include a "***spherical*** socket engaging end surface at said first end portion,

23    said ***spherical*** engaging end surface being the external surface at said first end portion."

24    (McMillion Decl., Ex. M, Claims 18, 25) (emphasis added). In essence, Joby was adding a claim

25    for the spherical shape of the tripod segments in order to defeat prior art. Further on February 22,

26    _____

27        [6] This photograph of the Joby Gorillapod was downloaded from the Magellan's Travel
    Supplies website.
    *http://www.magellans.com/store/Audio___Photo___Photo_AccessoriesPH102?Args=* (last
28    accessed June 19, 2008).

                                              5

1    2008 in a subsequent response to a rejection of claims, Joby amended its claims to specifically

2    identify "a plurality of connector bodies adapted for use in the leg of a camera tripod..." and

3    added new claims for "[a] camera tripod leg, comprising a plurality of couple connector

4    bodies..." (McMillion Decl., Ex. M, Claims 11, 18, 26). Interestingly here, Joby was attempting

5    to patent the entire flexible tripod leg for its functional purposes.[7] These claims are still pending

6    and the patent examiner has not reached a final determination on their validity.

7         Notwithstanding that no patent has issued on either the 2006 Parent Patent Application or

8    the 2007 Continuation Application, the existence of these utility patent applications is notable for

9    at least two reasons: (1) the utility patent applications claims the spherical ball and socket used in

10   the Gorillapod and the ring around the segments characterized as "a gripping portion comprising

11   a circumferential ring" (McMillion Decl., Ex. J); and (2) Joby has touted the fact that its

12   applications published to Tocad and its customers threatening potential litigation: "continued use,

13   sale, offer for sale, making, or importation of the knock-off product risks a potential liability for a

14   royalty up through the time of the patent's issuance. *See* 35 U.S.C. § 154(d)." (McMillion Decl.,

15   Ex. O).[8]

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   _____

25       [7] Not surprising, in the 2007 Continuation Application Joby attempts to claim the features of the Gorillapod in their entirety. Claims 15, 16 and 20 specifically claim a tripod "suitable for supporting a camera" which has "three flexible legs" "composed of a multiplicity of connector

26   pieces that join together in a ball and socket joints that permit pivotal movement between connecting ball and socket components to together provide each leg with sufficient flexibility to

27   substantially wrap around an object." (McMillion Decl., Ex. N, Claims 15,16, 20).
         [8] This letter is also relied on by Joby in its Motion for Preliminary Injunction. *See*

28   DeMarchi Decl. in Support of Joby's Motion for Preliminary Injunction, Ex. I.

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
Case No. 3:07-cv-06455-SI

1  The following table compares some of Joby's utility patent application claims, trade dress

2  assertions and advertising statements[9]:

| 2006/2007 Patent Application | Alleged Trade Dress | Joby's Advertising Statements |
|---|---|---|
| Ball and socket connectors. (2006 Application Claim 2)<br><br>Spherical sockets. (2006 Application Claim 18, 25)<br><br>Three flexible legs composed of a multiplicity of connector pieces that join together in ball and socket joints. (2007 Continuation Application Claim 16)<br><br>Leg with sufficient flexibility to substantially wrap around an object. (2007 Continuation Application Claims 16, 20, 21) | Multiple rounded segments (or "balls") appearing in a "chain", "string" or series of arrangements for each leg. (Compl. ¶8)<br><br>"legs made of rounded segments (or "balls") connected together." (Ans. to Interrogatory No. 2) | 30 or more articulating ball-and-socket joints. (www.joby.com)<br><br>Flexible Joints bend and rotate. (Doc. Prod. JOBY000150)<br><br>Legs bend and rotate 360 degrees…You can wrap the Gorillapod around a tree branch. (Doc. Prod. JOBY000072, 000075, 000078) |
| Gripping portion is a circumferential ring on connector. (2006 Application Claims 5, 14) | "each segment having a ring around the middle." (Comp. ¶ 8) | soft rings prevent your Gorillapod from slipping. (www.joby.com)<br><br>Ring & Foot Grips provide extra gripping power (Doc. Prod. JOBY000150) |
|  | Each segment ends in a rounded foot. (Ans. to Interrogatory No. 2) | rubberized feet prevent your Gorillapod from slipping. (www.joby.com)<br><br>Ring & Foot Grips provide extra gripping power. (Doc. Prod. JOBY000150)<br><br>Rubbery feet provide extra gripping power. (Doc. Prod. JOBY000072, 000075, 000078) |

[9] All documents referred to in this table are exhibits to the McMillion Declaration.

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
Case No. 3:07-cv-06455-SI

1    As will be demonstrated herein, the primary features of what Joby's claims comprise its

2    trade dress are functional and, therefore cannot constitute protectible trade dress as a matter of

3    law.

4    **C.    History of Tocad's Flexible Tripod**

5    In or about October 2006, Tocad introduced its flexible tripod, the Flexpod, which

6    also contained the ball and socket construction with a rubberized ring around the circumference

7    of the segments. (McMillion Decl. ¶4). At the time that Tocad began selling the Flexpod unit,

8    Joby did not have any published patent applications and the Gorillapod had only been on the

9    market for approximately eight months. There is no dispute that the Tocad Flexpod is similar to

10    Joby's Gorillapod and there is no dispute that Tocad was aware of the Gorillapod in developing

11    the Flexpod unit.[10] The Flexpod unit was sold in packaging which clearly displayed the Sunpak

12    brand name. (McMillion Decl., Ex. P). Tocad sells a variety of camera accessories under the

13    Sunpak brand, including different types of tripods (other than flexible tripods), flash accessories,

14    consumer and professional flash units, video lights, filters, conversion lenses, professional studio

15    lighting systems, batteries and chargers. (McMillion Decl., Ex.Q).

16    On September 6, 2007 Joby provided "formal" notice to Tocad that "Joby's patent

17    application No. 2007/0154254 has been published." Accordingly, "any continued use, sale, offer

18    for sale, making, or importation of infringing products risks potential liability for a royalty up

19    through the time of the patent's issuance." (McMillion Decl., Ex R)[11]. In subsequent

20    correspondence as well as in this lawsuit, Joby has asserted that Tocad's Flexpod also infringes

21    Joby's trade dress. In an attempt to avoid this brewing dispute, Tocad redesigned its flexible

22    tripod product and introduced a new version, the Flexpod Plus, in or about October 2007.

23

24    [10] It is likely that Joby will expend much effort describing Tocad as a "copycat" and the
Flexpod as a "knock-off." However, as will be set forth herein, copying is legitimate competition

25    where, as here, there is no intellectual property protection. Hence, Joby's repeated claims of
"copycat" or "knock-off" are a red herring. *See e.g. Sears Roebuck & Co. v. Stiffel Co.*, 376 U.S.

26    225 (1964) and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234 (1964) and cases cited
*infra* at 18, 21.

27    [11] Joby sent similar letters to Tocad and its customers after the Continuation Patent
Application published. (McMillion Decl., Ex. S). Notably, Joby relies on all of these letters in its

28    Motion for Preliminary Injunction. *See* DeMarchi Decl. Exs. H, I, M.

8

1   (McMillion Decl., Ex. T, Dkt. 11 - PI Mem. at 9).  As noted by Joby, the Flexpod Plus product

2   did not have the ball and socket construction but rather had a flexible aluminum core in each leg

3   "thus avoiding some of the patent issues." (Dkt. 11 - PI Mem. at 3).  The segments were also not

4   round but of a "flower pot" type shape. (McMillion Decl., Ex. T).  The Flexpod Plus still had the

5   ring around the segments but it was placed in the inner portion of the segments as opposed to the

6   outermost circumference.  It also had a completely different interconnect portion and attachment

7   clip. (McMillion Decl., Ex. T).  Despite all these differences, Joby claims that the Flexpod Plus

8   still infringes its alleged trade dress. (Compl. ¶11).

9           By Stipulation entered on May 6, 2008, in an attempt to avoid protracted litigation and

10  resolve Joby's Preliminary Injunction Motion, Tocad agreed to stop selling Flexpod and Flexpod

11  Plus units by May 30, 2008 and July 15, 2008 respectively.[12]

12  **II.    ARGUMENT**

13         **A.    Standards on Summary Judgment**

14          It is axiomatic that summary judgment is proper when the "pleadings, depositions,

15  answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

16  there is no genuine issue as to any material fact and the moving party is entitled to summary

17  judgment as a matter of law." *Microsoft Corp. v. EEE Business, Inc.*, 2008 WL 1990809, at *2

18  (N.D. Cal. May 5, 2008).  Further, "[a] principal purpose of the summary judgment process is to

19  identify and dispose of factually unsupported claims." *Id.*  "A dispute about a material fact is

20  'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving

21  party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ("Only disputes over facts that

22  might affect the outcome of the suit under the governing law will properly preclude the entry of

23  summary judgment.").  Because Plaintiff bears the burden of proof, it must designate "specific

24  facts" showing that there is a genuine issue of material fact. *Global Manufacture Group, LLC v.*

25

26         [12] Joby has taken the position that while the Stipulation allows Tocad to continue selling
    to its customers through the identified dates, Joby can still pursue the customers to whom Tocad
27  is selling these products.  Tocad believes that this position is contrary to the letter if not the spirit
    of the Stipulation and that Joby's conduct in contacting Tocad's customers is improper. (Dkt. 69
28  - June 2, 2008 Joint Letter to the Court).

9

1     *Gadget Universe.com,* 417 F. Supp. 2d 1161, 1155-56 (S.D. Cal. 2006). Significantly, "the

2  moving party has no burden to negate or disprove matters on which the opponent will have the

3  burden of proof at trial." *Novell, Inc. v. Weird Stuff, Inc.,* 0094 WL 16458729, at *7 (N.D. Cal.

4  Aug. 2, 1993). The summary judgment standard evaluates "whether the evidence presents a

5  sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

6  must prevail as a matter of law." *Anderson,* 477 U.S. at 252. Conversely, "[i]f the evidence is

7  merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at

8  249-50. Joby will be unable to satisfy its burdens in this case and summary judgment should be

9  granted in Tocad's favor.

10      **B.**    **There is No Genuine Issue of Material Fact that the Gorillapod Does Not**
11              **Have a Protectible Trade Dress**

12      This case is ripe for summary judgment as the allegations of Joby's Complaint, its

13 Answers to Interrogatories, its previous preliminary injunction submissions, and its published

14 utility Patent Applications demonstrate that as a matter of law, the Gorillapod does not have a

15 protectible trade dress. The determination of whether Joby has a protectible trade dress does not

16 require discovery from Tocad—information regarding the functionality of the Gorillapod features

17 can be gleaned from Joby's own documents and publicly available information.

18      The "trade dress of a product is essentially its total image and overall appearance."

19 *Global,* 417 F. Supp. 2d at 1166. However, "trade dress protection may not be claimed for

20 product features that are functional." *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S.

21 23, 29 (2001). A person asserting trade dress protection has the burden of establishing that the

22 matter sought to be protected is not functional and that it has acquired secondary meaning. 15

23 U.S.C. §1125(a)(3); *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.,* 529 U.S. 205, 214 (2000).

24 While functionality is a question of fact, it can be decided on summary judgment. *Global,* 417 F.

25 Supp. 2d at 1167 (citing *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.,* 158 F.3d 1002, 1006 (9th

26 Cir. 1998)); *Vision Sports, Inc. v. Melvill Corp.,* 888 F.2d 609, 614 (9th Cir. 1989). Moreover,

27 ***secondary meaning must exist before the alleged infringement began.*** *Braun Inc. v. Dynamic*

28

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
Case No. 3:07-cv-06455-SI

1   *Corp. of America,* 975 F.2d 815, 826 (Fed. Cir. 1992) (emphasis added); *Levi Strauss & Co. v.*

2   *Blue Bell, Inc.,* 778 F.2d 1352, 1358 (9th Cir. 1985); *Continental Laboratory Products, Inc. v.*

3   *Medax International, Inc.,* 114 F. Supp. 2d 992, 1002 (S.D. Cal. 2000). Here, Joby cannot

4   establish either element as a matter of law and therefore, summary judgment should be granted in

5   Defendant's favor.

6                **1.**     **Joby cannot prove that its trade dress is non-functional**

7        In order to determine whether a product's trade dress is functional, courts consider several

8   factors: (1) whether the design yields a utilitarian advantage; (2) whether alternative designs are

9   available; (3) whether advertising touts the utilitarian advantages of the design; and (4) whether

10   the particular design results from a comparatively simple or inexpensive method of manufacture.

11   *Talking Rain Beverage Co., Inc. v. South Beach Beverage Co.,* 349 F.3d 601, 603 (9th Cir. 2003);

12   *Switchmusic.com, Inc. v. U.S. Music Corp.,* 416 F. Supp. 2d 812, 820 (C.D. Cal. 2006). "None of

13   these factors is dispositive and all should be considered collectively." *Id.* Most, if not all of these

14   factors mandate a finding of functionality in this case. It is Joby's burden to prove that the

15   features it claims as its trade dress are nonfunctional. *TrafFix,* 532 U.S. at 29. Significantly,

16   "[b]ecause affording trade dress protection to product designs may hinder legitimate competition;

17   the Ninth Circuit has advised district courts to evaluate such claims with greater scrutiny than

18   claims involving other forms of trade dress." *Continental Lab.,* 114 F. Supp. 2d at 997. Indeed,

19   as the Supreme Court noted in the *TrafFix* case, "in *Wal-mart,* we were careful to caution against

20   misuse or over extension of trade dress. We noted that 'product design almost invariably serves

21   purposes other than source identification.'" *TrafFix,* 532 U.S. at 29 (quoting *Wal-Mart Stores,*

22   *Inc.* 529 U.S. at 213). Accordingly, Joby's alleged trade dress must be carefully described and

23   narrowly construed.

24                **a.**     **The Gorillapod design features are functional**

25        Joby admits and it is clear that "a product feature is functional and cannot serve as a

26   trademark, if it is essential to the use or purpose of the article or it affects the quality of an

27   article." *Eppendorf-Netheler Hinz GMBH v. Ritter GMBH RK,* 289 F.3d 351, 355 (5th Cir. 2002)

28

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
Case No. 3:07-cv-06455-SI

1    (quoting *TrafFix,* 532 U.S. at 29); (Dkt. 11 - PI Mem. at 14).  Significantly, if the product feature

2    "is the reason the device works, then the feature is functional." *TrafFix,* 532 U.S. at 34.  Further,

3    "a utility patent is strong evidence that the features therein claimed are functional.  If trade dress

4    protection is sought for those features the strong evidence of functionality based on the previous

5    patent adds great weight to the statutory presumption that features are deemed functional until

6    proved otherwise by the party seeking trade dress protection." *Id.* at 29-30.  In explaining the

7    different protections of the Lanham Act and patent law, the Supreme Court in *TrafFix* further

8    noted that:

9           [t]he Lanham Act does not exist to reward manufacturers for their
       innovation in creating a particular device; that is the purpose of the

10          patent law and its period of exclusivity.  The Lanham Act,
       furthermore, does not protect trade dress in a functional design

11          simply because an investment has been made to encourage the
       public to associate a particular functional feature with a single

12          manufacturer or seller.  The Court of Appeals erred in viewing MDI
       as possessing the right to exclude competitors from using a design

13          identical to MDI's and to require those competitors to adopt a
       different design simply to avoid copying it.  MDI cannot gain the

14          exclusive right to produce sign stands using the dual spring design
       by asserting that consumers associate it with the look of the

15          invention itself.  Whether a utility patent has expired or there has
       been no utility patent at all, a product design which has a particular

16          appearance may be functional because it is "essential to the use or
       purpose of the article" or "affects the cost or quality of the article."

17

18   *TrafFix,* 532 U.S. at 34-35 (quoting *Inwood Laboratories, Inc. v. Ives Labpratories, Inc.,* 456

19   U.S. 844, 850 (1982)).

20        Based upon these standards and legal principles, Joby cannot establish that features it

21   claims as its trade dress are nonfunctional.  Joby describes its trade dress as follows:

22          The Gorillapod has a body section and three legs made of rounded
       segments (or "balls") connected together.  Each of the segments in

23          the legs has a ring around the middle in a color that contrasts with
       the color of the segment, and each segment ends in a "rounded

24          foot."  The rounded body, the rounded leg segments, the rounded
       feet, the proportions that Joby selected for the body, legs and feet,

25          and the contrasting rings give the tripod a playful striped look.

26   (McMillion Decl., Ex. G, Joby's Ans. to Int. No. 2).

27        Joby has previously claimed most of these product features are functional.  The so-called

28   "rounded segments (or 'balls') connected together" refers to the "spherical" ball and socket

12

1    construction of the Gorillapod and the "ring around the middle" is the "gripping portion

2    comprising a circumferential ring," both of which are claimed in the utility patent application.[13]

3    (McMillion Decl., Ex. J).  Given the duty of candor required in patent applications, these features

4    must be considered to be functional by Joby.  Indeed, Joby has threatened patent litigation in

5    connection with these features.[14]  Moreover, Joby chose to have its trade dress contain precisely

6    the same elements for which it is seeking utility patent protection, namely the "spherical" ball and

7    socket construction and the circumferential ring as the "overall look."  Joby could have utilized a

8    different appearance for its Gorillapod rather than the functional features identified in its utility

9    patent.  Joby cannot have it both ways—i.e. claim spherical ball and socket construction in its

10   utility patent and use the ball and socket "overall look" as its trade dress.

11        These same features are also touted by Joby as the reason that the Gorillapod works:  the

12   "flexible joints bend and rotate 360° to form the perfect shape" and the "soft rings and rubberized

13   feet prevent your Gorillapod from slipping in even the toughest environments."  (www.joby.com)

14   (McMillion Decl., Ex. E).  While the "rounded foot" is not mentioned in the utility patent

15   application, it is actively promoted by Joby as performing the function of "prevent[ing] the

16   Gorillapod from slipping."  (www.joby.com) (McMillion Decl., Ex. E).  Further, the Joby Product

17   Overview, only focuses on the functional features of the design.  (McMillion Decl., Ex. F).

18   Additionally, these features are also mentioned in the reviews and other articles written about the

19   Gorillapod as being key to the way in which the Gorillapod works:

20        • **Digital Photography**, 8/29/07, *Grip Like a Gorilla*—"this flexible little wonder is
         covered with rubberized joints that help make it grip to most anything that you
21         wrap it around.  That dexterity allows me to use most anything—a chair, lamppost,
22         stair rail or tree limb—as a secure mount for my digital point and shoot."

23        • **Calumet Photographic**, July 2007, *The World is Your Tripod*—"Each model [of
         the Gorillapod] has round rubber shoes at the bottom of its three legs and a rubber
24         ring around each bulbous joint, several of which make up the legs.  The rubber is

25   _____

26        [13]    Note that whether or not the patent ultimately issues, statements made to the
     USPTO are subject to the duty of candor and must be truthful.  *See* 37 C.F.R. §1.56 (Rule 56 –
27   Duty of Candor and Good Faith); s*ee also Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168
     F.3d 28, 30 (Fed.Cir.1999).
28        [14] Patent infringement is obviously evidence of functionality.  *TrafFix*, 532 U.S. at 31-32.

                                                13
     _____

1   key. Friction and gravity have everything to do with placing a camera and
2   Gorillapod."

3   • **Bachelor Guy**, 6/13/07, *Got a Click-Happy Dad?*—"this tripod is made of 30 or
    so rubber-coated ball and socket joints that can bend and twist into just about any
4   shape, gripping on to whatever dad needs to get his shot."

5   • **Onboard Snowboarding**, 09/05/06, *Onboard Downtime, Gorillapod*—"Each of
    the grippy ball & socket joints on the legs is able to bend and rotate 360 degrees.
6   The base joints also have larger grips, so the tripod can stand in the traditional
7   manner without slipping."

8   • **Pocket-Lint-Gadget News and Reviews**, 08/20/06, *Want to take pictures
    anywhere? This might be just the answer*—"Each of the Gorillapod's legs are
9   articulated along their entire length using small ball and socket joints that allow the
    entire leg to move and swivel in any direction. Each articulation can rotate
10  through 360-degrees and a rubberized gripping rib rings each socket part of each
11  joint. Add to the ensembles rubberised feet and Gorillapod can grip on uneven,
    rough or vertical surfaces allowing the Gorillapod to be positioned anywhere while
12  keeping the camera level."

13  (*See* McMillion Decl., Ex. D, Bevirt Decl., Ex. G).

14      Additionally, to the extent Joby claims that trade dress feature of the "circumferential

15  ring" which is the "gripping portion" is its contrasting color, that feature alone cannot save Joby's

16  claimed trade dress from the functionality realm.[15] First, Joby cannot claim protection in the use

17  of "contrasting colors." *Keystone Camera Products Corp. v. Ansco Photo-Optical Products*

18  *Corp.*, 667 F. Supp. 1221, 1229 (N.D. Ill. 1987). In *Keystone Camera*, the Court noted that to

19  "grant plaintiff trade dress protection for combinations of unspecified contrasting colors would

20  allow the plaintiff to monopolize all combinations of contrasting colors." *Id.* Moreover, in cases

21  in which trademark or trade dress protection has been allowed for colors or combinations of

22  colors, those colors or color combinations have been specifically defined. *See e.g. Qualitex Co. v.*

23  *Jacobson Products Co., Inc.*, 514 U.S. 159 (1995) (green-gold color of press pads protectible).

24  Here, Joby is claiming protection in *the idea* of contrasting colors—that is not protectible.

25  Further, the overbreadth of Joby's claim is best illustrated by the different use of color by Joby

26  and Tocad. Joby uses black as the color of its tripods with the rings and feet in a different color

27

28  [15] As noted however, the trade dress claimed by Joby includes far more than just the rings
    around the middle in contrasting colors.

14

1  such as red, green or yellow. (McMillion Decl., Ex. I). Tocad on the other hand varies the color

2  of the tripod and the rings and feet are in a lighter color. (McMillion Decl., Ex. U).



**Gorillapod Colors**                                    **Flexpod Colors**

13      Interestingly, Tocad was first to market with colors other than the black tripod with gray

14  or ivory accents.[16] Moreover, "[f]or an overall product configuration to be recognized as a

15  trademark, *the entire design* must be nonfunctional." *Clamp Mfg. Co. v. Enco Mfg. Co.,* 870 F.2d

16  512, 516 (9th Cir. 1989) (emphasis added). Hence, even if the contrasting colors were a protected

17  nonfunctional feature, that does not render the entire Gorillapod design nonfunctional.

18  Additionally, Joby cannot simply claim that these individual functional features are combined in

19  an arbitrary way so that the "total image" or "overall appearance" is nonfunctional:

20              [W]here the whole is nothing other than the assemblage of
               functional parts, and where even the arrangement and combination
21             of the parts is designed to result in superior performance, it is
               semantic trickery to say that there is still some sort of separate
22             'overall appearance' which is nonfunctional.

23      *Leatherman Tool Group Inc., v. Cooper Industries, Inc.* 199 F.3d 1009, 1013 (9th Cir.

24  1999); *Antioch Co. v. Western Trimming Corp.,* 347 F.3d 150, 158 (6th Cir 2003).

25

26      [16] Tocad first introduced the Flexpod in colors in November 2006, just one month after
        entering the market. Joby, however, did not sell any colored units until August 2007, nine
27      months after Tocad had already been doing so. (*See* McMillion Decl. ¶ 3-4, Exs. B, C).
        Moreover, even Tocad's original Flexpod had a different color scheme than Joby's – Joby's was
28      black and gray, while Tocad's was black and ivory.

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
Case No. 3:07-cv-06455-SI

1    Further, to the extent that Joby is claiming that its trade dress is actually the type of

2    product, *i.e.* a flexible tripod that can attach to various surfaces, "one supplier may not

3    monopolize the configuration to the exclusion of others." *Antioch*, 347 F.3d at 159. Indeed, "if

4    the utilitarian aspects of the product *are its essence, only* patent law protects *its configuration*

5    from use by competitors. *Global*, 417 F. Supp. 2d at 1168 (quoting *Clamp Mfg.*, 870 F.2d at 516

6    (emphasis added by *Global* court); *TrafFix*, 532 U.S. at 34 ("The Lanham Act does not exists to

7    reward manufacturers for their innovation in creating a particular device; that is the purpose of the

8    patent law and its period of exclusivity.").

9         It cannot seriously be disputed that the configuration of the Gorillapod is functional and

10    that these functional features are precisely what Joby asserts are its trade dress and the features

11    Joby touts in its advertising as the reason that the Gorillapod performs as it does.[17]

12              **b.    The possible existence of alternative designs does not establish
                        non-functionality**

13

14         Joby also claims that "the existence of alternative designs that perform the same function

15    is persuasive evidence that Joby's trade dress is non-functional." (Dkt. 11 - PI Mem. at 15).[18]

16    Joby then cites to two products that are "examples of different camera support designs," but they

17    are not flexible tripods that can "firmly secure your camera to just about anything—anywhere and

18    everywhere." (McMillion Decl., Ex. E) (www.joby.com). Hence, they are not truly "alternative

19    designs that perform the same function." Moreover, "[e]ven if there are alternative designs

20    available in the marketplace, they cannot turn a feature that is functional under the

21    traditional...definition into a non-functional feature which is the exclusive trade dress property of

22    one seller." *Antioch*, 347 F.3d at 155. If a feature is functional, it does not matter whether there

23    are alternative designs available that perform the same function—the availability of alternative

24

25         [17] In his Declaration, Bevirt claims that the advertising and promotion "typically
      emphasizes the product's fun, animal-like qualities." (McMillion Decl., Ex. D, Bevirt Decl. ¶9).

26    However, the only such reference on its website is to "Gorilla fun" and all other descriptions
      concern the functional features. As noted by the decision in *Leatherman, supra*, such limited

27    reference to the look is not enough to overcome the functional claims.
         [18] Notably, all alternative designs proposed by Tocad have been rejected by Joby.

28    (McMillion Decl., Ex. H).

                                                    16
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━
DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
Case No. 3:07-cv-06455-SI

1  designs is irrelevant. "There is no need...to engage...in speculation about other design

2  possibilities which might serve the same purpose where functionality is established." *TrafFix,*

3  532 U.S. at 33; *See also Antioch,* 347 F.3d at 155.  Indeed, if the design is the reason that that the

4  device works, "other designs need not be attempted." *TrafFix,* 532 U.S. at 33-34.

5          Suggesting that Tocad could have had the ball and socket construction and covered the

6  exterior, Joby asserts that "[n]or does the ball-and-socket construction of the Gorillapod dictate its

7  shape...Ball-and-socket connectors can and do have many different *exterior* shapes, such as

8  cylinders or cubes, or they can have small, compressed segments." (Dkt. 11 - PI Mem. at 16).

9  However, this argument is contrary to the Supreme Court's decision in *TrafFix* where the Court

10  noted that:

11              [b]ecause the dual spring design is functional, *it is unnecessary for*
               *competitors to explore designs to hide the springs, say by using a*
12             *box or framework to cover them,* as suggested by the Court of
               Appeals.  The dual-spring design assures the user the device will
13             work.  If buyers are assured the product serves its purpose by seeing
               the operative mechanism that in itself serves an important market
14             need.  *It would be at cross-purposes to those objectives,* and
               *something of a paradox, were we to require the manufacturer to*
15             *conceal the very item the user seeks.*

16  *TrafFix,* 532 U.S. at 34 (emphasis added).

17          Hence, if the spherical ball and socket construction is functional, as it clearly is, Tocad

18  would not have to "conceal" it and Joby's argument regarding this type of "alternative design" is

19  unfounded.  Further, "the Ninth Circuit has stated that the availability of alternative designs 'by

20  itself is insufficient to prove non-functionality; there must be a sufficient number of alternative

21  designs such that providing trademark protection to one design would not hinder competition.'"

22  *Switchmusic.com,* 416 F. Supp. 2d at 820-21 (quoting *Disc Golf Ass'n,* 158 F.3d at 1008).  At

23  issue in *Switchmusic.com* was the alleged trade dress of a particular guitar design.  The Defendant

24  (who was claiming trade dress protection of its design) submitted a catalogue containing images

25  of numerous guitars by various manufacturers and claimed that the catalogue showed that there

26  are a wide variety of guitar body shapes and styles in the marketplace.  The Court disagreed

27  noting that "[o]n the contrary, the catalogue shows that there are a limited number of shapes and

28  styles available for guitars. If Defendants were granted protection for their trade dress, it would

17

1   have the undesired effect of severely hindering competition by reserving a particular design for

2   Defendants' exclusive use." *Id.* at 821.[19]

3          As noted, it is likely that much of Joby's argument will be premised on the allegation that

4   Tocad copied the Gorillapod. However, even if true, it is well settled that unless protected by a

5   patent or a copyright, "functional product features may be copied freely by competitors in the

6   marketplace." *TrafFix*, 532 U.S. at 23. As the Court in *TrafFix* further noted:

7                  *Trade dress protection must subsist with the recognition that in*
                   *many instances there is no prohibition against copying goods and*
8                  *products.* In general, unless an intellectual property right protects
                   and item, it will be subject to copying. As the Court has explained,
9                  copying is not always discouraged or disfavored by the laws which
                   preserve our competitive economy. *Allowing competitors to copy*
10                 *will have salutary effects in many instances.*

11  *Id.* (emphasis added).

12         Indeed, "there is nothing inherently wrong" in copying a competitor's product. *Tie Tech,*

13  *Inc. v. Kinedyne Corp.,* 296 F.3d 778, 785 (9th Cir. 2002). In fact, "a product's manufacturer

14  'does not have rights under trade dress law to compel its competitors to resort to alternative

15  designs which have a different set of advantages and disadvantages. Such is the realm of patent

16  law.'" *Id.* at 786 (quoting *Leatherman,* 199 F.3d at 1014, n.7). Where the "overall design and

17  appearance" was functional, "competitors thus had unrestrained permission to copy 'slavishly' or

18  faithfully,' *id.* at 1012, n.4, those nonfunctional elements as copying 'preserves our competitive

19  economy." *TrafFix,* 532 U.S. at 29. Based upon Joby's own statements in its utility patent

20  applications, the statements Joby makes in its advertising and promotion and how the product is

21  generally perceived, Joby cannot establish that its claimed trade dress is nonfunctional. Since

22  there is nothing protectible about these features, competitors are free to copy them. *Bonito Boats,*

23  *Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 160 (1989); *TrafFix,* 532 U.S. at 29; *Eppendorf,*

24  289 F.3d at 355; *Antioch,* 347 F.3d at 160. In this situation, the fact that Tocad may have copied

25  the unprotected Gorillapod does not create liability.

26

27         [19]     Joby's argument on alternative designs also presents an interesting conundrum—
    on the one hand Joby asserts that the Flexpod Plus demonstrates the existence of "alternative
28  designs" but yet Joby claims that the Flexpod Plus still infringes the Gorillapod trade dress.
                                                    18

1

2

     c. **Joby's advertising touts the utilitarian features of the Gorillapod**

3    Not only do the product reviews tout the "utilitarian advantages of the design" but so does

4 Joby in its own advertising. For example, on its website, Joby touts the "utilitarian advantages"

5 of the rubberized ring and foot grips noting that they "provide extra gripping power to grapple

6 wherever you want to go." (McMillion Decl., Ex. E). The website further emphasizes the

7 operational advantages of the ball and socket design noting that "the flexible joints bend and

8 rotate 360° to form the perfect shape" and that "you can bend and twist them so they'll always

9 keep your camera steady." (McMillion Decl., Ex. E). Other Joby advertisements, specifically

10 tout the functional features of its design, highlighting that the "RING & FOOT GRIPS provide

11 extra gripping power to most surfaces" and the "FLEXIBLE JOINTS bend and rotate 360° to

12 form the perfect shape." (McMillion Decl., Ex. V). Joby also consistently advertises the features

13 of the Gorillapod in the following message:

14      The Joby Gorillapod is a bendable, flexible tripod that secures your
      camera to nearly any surface. Its legs bend and rotate 360 degrees,

15      while its rubbery feet provide extra gripping power. You can wrap
      the Gorillapod around a tree branch, hang it from a railing, or perch

16      it on a rock during your next hiking trip. The possibilities are
      endless!

17

18  (McMillion Decl., Ex. W). It is well settled that if a seller "advertises the utilitarian

19 advantages of a particular feature this constitutes strong evidence of functionality." *Disc Golf*

20 *Ass'n*, 158 F.3d at 1009. In *Switchmusic.com*, Defendants advertised their guitars "as giving the

21 user an operational advantage that is not found in other guitars." *Switchmusic.com*, 416 F. Supp.

22 2d at 821. Here, the entire focus of the advertising of the Gorillapod is its "operational

23 advantages," i.e. that it "firmly secures your camera to just about anything—anywhere and

24 everywhere" and that "it is the only tripod malleable enough to provide you with the perfect shot

25 while wrapped around a tree branch, hanging from a pole, or perched on a jagged rock."

26 (McMillion Decl., Ex. F).

27    Significantly, in *Talking Rain,* which involved an analysis of the shape of a bottle for

28 flavored and unflavored water, the Court found that "Talking Rain's advertising touts its bottle's

19

utilitarian features. Talking Rain, which refers to its bottle as the 'Grip Bottle,' argues that its

'Get a Grip!' slogan involves a double-meaning because the slogan is a slang expression meaning

'get in control.'" The Court noted that "at least one meaning of its advertising is that the bottle is

easy to grip. We are not required to ignore advertising that touts functional features just because

those ads may include messages-subtle or otherwise-aimed at nonfunctional features." *Talking*

*Rain,* 349 F.3d at 603-04. Hence, that Joby may occasionally refer to the "fun" quality of the

Gorillapod is not enough given all of the advertising and promotion which touts the functional

features.

### d.     Summary

Joby hoists itself on its own petard by its claims in its utility patent applications, its

statements in its advertising and promotion and the statements and arguments made by Joby in

connection with its request for preliminary injunction. Put simply, the law mandates that Joby

cannot have it both ways – *i.e.* claim that certain features are functional and entitle it to a utility

patent and at the same time, try and use those same features to assert trade dress protection. The

Court need look no further than Joby's own statements to find that the features claimed as its

trade dress are clearly functional and cannot be protected under principles of trademark law.

### 2.     Joby cannot establish secondary meaning

Since Joby cannot establish the non-functionality of its trade dress in the first instance, the

Court need not even consider whether or not Joby can establish secondary meaning. Nonetheless,

Joby's trade dress claim fails on this element as well. As Joby correctly noted in its Preliminary

Injunction Memorandum, to establish a protectible trade dress, Joby must demonstrate that the

Gorillapod has acquired secondary meaning, that is, that the purchasing public associates the

trade dress with a particular source. (Dkt. 11 - PI Mem. at 16-17). What Joby wholly failed to

point out is that the product must have acquired the secondary meaning "*before* the defendant

introduced its competing product." *Global,* 417 F. Supp. 2d at 1171. *See also, Braun,* 975 F.2d

at 826 ("A claim of trade dress infringement fails if secondary meaning did not exist before the

infringement began."); *Switchmusic.com,* 416 F. Supp. 2d at 821-22 (citing *Levi Strauss,* 778 F.2d

1    at 1358 for the proposition that plaintiff must show that its design obtained secondary meaning

2    *before* defendant commenced its allegedly infringing activities).

3        As its "evidence" of secondary meaning, Joby relies on:  (1) the alleged copying by

4    Tocad; (2) instances of alleged confusion between Joby and Tocad's products; (3) Joby's eight

5    month period of exclusivity (which Joby inaccurately repeatedly claims is "almost a year"); (4)

6    Joby's advertising expenditures; and (5) press coverage and product reviews of the Gorillapod.

7    (*See e.g.* Dkt. 11 – PI Mem. at 16-18).  None of these "facts" are sufficient to demonstrate that the

8    Gorillapod obtained secondary meaning *prior to* the October 2006 introduction of the Tocad

9    Flexpod.

10       First, even "proof of deliberate copying is not determinative of secondary meaning "as it

11   does not necessarily establish that the copying is intended to confuse customers and capitalize on

12   recognition of the plaintiff's product." *Walker & Zanger v. Paragon Indus., Inc.,* 2007 WL

13   1302980, at *11 (N.D. Cal. May 3, 2007).  In *Walker & Zanger,* the Court also noted that

14   "[c]ompetitors may intentionally copy product features for a variety of reasons; they may, for

15   example, choose to copy design traits in response to consumer preference." *Id.*  Hence, the mere

16   fact that Tocad may have copied the Gorillapod, without any evidence that Tocad intended to

17   capitalize on the association with Joby, does not demonstrate secondary meaning.  This is

18   particularly true in this case where as Joby acknowledges, Tocad is a well known supplier (Tocad

19   has a "more established network of distributors and retailers, built up over the company's 20-year

20   history.") (Dkt. 11 - PI Mem. at 23).  Moreover, the product packaging prominently displays the

21   "Sunpak" brand name and the "Flexpod or Flexpod Plus" product name.  (McMillion Decl., Ex.

22   P).[20]

23       Second, all of the alleged instances of confusion relied upon by Joby as support for

24   secondary meaning obviously occurred after Tocad's entry into the market in October 2006 –

25   indeed, significantly after:  February 2008, summer 2007 and August 2007.  (Dkt. 11 – PI Mem.

26   _____

27   [20]    Joby attempts to attribute some significance to the fact that both the Joby and Tocad
     products are displayed in clear packaging. (Dkt. 11 - PI Mem. at 6).  Many small consumer products,
     especially small electronics and accessories are displayed in see-through packaging. (McMillion Decl.,
28   Ex. X)

                                          21

1  at 17; Waddell Decl. ¶¶ 3, 4, 5).  Hence, these instances of alleged confusion cannot provide a

2  basis for a determination of whether or not the Gorillapod had acquired secondary meaning by

3  October 2006.  Third, Joby has not provided any evidence that in the eight month period of

4  exclusivity, the Gorillapod acquired secondary meaning.  In fact, such a short period before the

5  introduction of competing products is "'evidence point[ing] strongly away from a finding of

6  secondary meaning.'"  *Braun*, 975 F.2d at 826 (quoting *Cicena, Ltd. v. Columbia*

7  *Telecommunications Group*, 900 F.2d 1546, 1552 (Fed Cir. 1990)).  In both *Braun* and *Cicena*

8  eighteen months was not sufficient for the products to acquire secondary meaning.  Indeed, as the

9  Court noted in *Braun* "while not impossible, it is difficult for a product to acquire secondary

10  meaning during an 18-month period." *Id.  See also Keystone Camera*, 667 F. Supp. at 1231 (14

11  months "so short-lived that secondary meaning could not have been established"); *Global*, 417 F.

12  Supp. 2d at 1171 ("very brief time" of four to six months that Plaintiff's scooter was on the

13  market made it "highly unlikely that the purchasing public would have formed a mental

14  association between the overall shape of the Q scooter and the Plaintiff as 'the' source.").

15      Fourth, while the Bevirt Declaration asserts that during the "first nine months after launch

16  of the Gorillapod, we promoted the product at four trade shows and spent approximately

17  $178,000 on advertising and promotion in print and in other media," (McMillion Decl., Ex. D,

18  Bevirt Decl. ¶ 11), the bulk of those expenditures occurred after the Tocad Flexpod's October

19  2006 entry in the market and likely in anticipation of the holiday marketing season. (McMillion

20  Decl., Ex. Y).  Prior to October 2006, Joby had only spent approximately **REDACTED** in advertising

21  and promotional expenses. (McMillion Decl., Ex. Y).[21]  Moreover, not only did Joby spend very

22  little in advertising during this exclusive period, but it is not the amount of advertising or the

23  amount of money spent on advertising that is probative; rather it is how effective the advertising

24  is to creating secondary meaning.  *Braun*, 975 F.2d at 826-27 ("the fact that Braun spent an

25  arguably large sum of money on advertising is of limited probative value.  Braun did not proffer

26  ───────────

27  [21]     Despite Bevirt's claims at spending $178,000 in advertising, the Income Statements for Joby show only ` ` spent on marketing and trade shows from January 2006 to September 2006.

28  (*See* McMillion Decl. ¶26, Ex.Y).  In any event, according to the Bevirt Declaration, Joby spent at most $178,000 prior to the introduction of the Tocad Flexpod.  **REDACTED**
                                                                                          22

1   evidence establishing that the advertising effectively created secondary meaning as to the

2   blender."); *Continental Lab.*, 114 F. Supp. 2d at 1000 ("A large expenditure of money does not in

3   itself create legally protectable rights. The test of secondary meaning is the effectiveness of the

4   effort to create it.").

5        Moreover, the press coverage and reviews of the Gorillapod are also not probative of

6   whether or not the Gorillapod had attained secondary meaning at the time of the Tocad Flexpod

7   entry in October 2006.  In *Braun,* the Court noted that "Braun's limited evidence as to

8   advertising, sales and media attention, standing alone, is not sufficient to demonstrate that the

9   consuming public identified the blender design with its maker, Braun."  *Braun,* 975 F.2d at 826.

10  Commenting on the existence of product reviews, in *Switchmusic.com,* the Court noted that

11  "these reviews fail to show that Defendants acquired secondary meaning in their trade dress.

12  They are merely reviews concerning the attributes of Parker guitars."  Additionally, the press

13  coverage that occurred before October 2006 does not support an inference of secondary meaning.

14  Those product reviews and articles primarily address the functional features of the Gorillapod.

15  They tout the utilitarian advantages of the design, but do not stress the color, shape, or "overall

16  look."  *See First Brands Corp. v. Fred Myer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987)

17  (advertising campaign failed to establish secondary meaning because it did not attempt to

18  engender consumer identification or urge consumers to look for the color or shape of the

19  product).

20       Finally, much of the press coverage and reviews which Joby relies on occurred after the

21  entry of the Tocad Flexpod. (*See* McMillion Decl., Ex. D, Bevirt Dec. ¶10, Ex. G & H).  Any

22  media attention after October 2006 has no legal relevance to secondary meaning. *Continental*

23  *Labs,* 114 F. Supp. 2d 992 at 1001-1002. (Advertisements running after the alleged infringing

24  activity began lack any legal relevance to the question of secondary meaning).

25       For these reasons, Joby is unable to demonstrate that the Gorillapod has acquired

26  secondary meaning.

27

28

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
Case No. 3:07-cv-06455-SI

1

## III.    CONCLUSION

2          This is a straightforward trade dress case involving a simple product, a flexible tripod – a

3    product which Joby introduced into the market only months before other manufacturers released

4    their products.  Joby's Gorillapod and the Tocad Flexpod may look similar, but Joby's claims of

5    trade dress infringement are legally deficient because the Gorillapod does not have a protectible

6    trade dress.  Joby cannot prove that its alleged trade dress is non-functional.  It has sought patent

7    protection on the very features which it now claims as a distinctive trade dress. Given the

8    functionality of Joby's Gorillapod, the Court does not have to even consider if it has attained

9    secondary meaning.  Nonetheless, Joby is unable to prove that element as well.

10          Consequently, for the foregoing reasons, Tocad is entitled to judgment as a matter of law

11    and respectfully requests that this Court grant its Motion for Summary Judgment.

12

13    Date:    June 20, 2008                    By:___/s/ Debra R. Bernard_____

14                                             Michael O. Warnecke, IL Bar No. 2942291
                                               Debra R. Bernard, Bar IL No. 6191217
15                                             Brandy McMillion, IL Bar No. 6294679
                                               (pro hac vice application pending)
16                                             Perkins Coie LLP
                                               131 South Dearborn Street, Suite 1700
17                                             Chicago, IL  60603-5559
                                               Telephone:  312.324.8400
18                                             Facsimile:  312.324.9400
                                               MWarnecke@perkinscoie.com
19                                             DBernard@perkinscoie.com
                                               BMcMillion@perkinscoie.com
20
                                               Jason A. Yurasek
21                                             PERKINS COIE LLP
                                               Four Embarcadero Center
22                                             Suite 2400
                                               San Francisco, CA 94111-4131
23                                             Telephone:  415.344.7021
                                               Facsimile:  415.344.7221
24                                             JYurasek@perkinscoie.com

25                                             Attorneys for Defendant

26    64091-0006/LEGAL14329783.4

27

28
                                               24